Ben M. Harrington (SBN 313877)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
Email: benh@hbsslaw.com

Steve W. Berman (*pro hac vice* forthcoming)
Jerrod C. Patterson (*pro hac vice* forthcoming)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
Email: steve@hbsslaw.com
       jerrodp@hbsslaw.com

(Additional counsel in signature block.)

*Attorney for Plaintiffs and the Proposed Classes*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID BUI-FORD, IGOR KRAVCHENKO, MICAH SIEGAL, and LUCAS BUTLER, on behalf of themselves and others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>TESLA, INC. d/b/a TESLA MOTORS, INC., a Delaware corporation,<br><br>Defendant. | Case No. 3:23-cv-02321<br><br>**CLASS ACTION COMPLAINT** |

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ............................................................................................. 1

II. PARTIES ...................................................................................................... 4

    A. Plaintiffs ............................................................................................ 4

        1. California Plaintiff ................................................................. 4

        2. Illinois Plaintiff .................................................................... 4

        3. Michigan Plaintiff ................................................................ 5

        4. Washington Plaintiff ............................................................ 5

    B. Defendant ........................................................................................... 5

III. VENUE AND JURISDICTION ....................................................................... 7

IV. FACTUAL ALLEGATIONS ........................................................................... 8

    A. Tesla routinely pushes out software updates for the Class Vehicles. ................... 8

    B. Aftermarket software products confirm battery depletion. ................... 9

    C. Tesla represented that the battery would last the lifetime of the vehicle. ........................................................................................ 10

    D. Tesla knew about the effect of software updates from public complaints. ..................................................................................... 11

        1. Tesla has known about the effect of software updates based on its own monitoring of the industry. ................................... 11

        2. Complaints on publicly available internet forums and blogs show that Tesla knows about battery depletion following software updates. ........................................................... 12

    E. Prior litigation demonstrate Tesla knows software updates diminish battery performance. ............................................................. 15

V. CLASS ACTION ALLEGATIONS ................................................................ 16

VI. CAUSES OF ACTION ................................................................................. 19

    A. Claims brought on behalf of the Nationwide Class, or in the alternative, on behalf of the Sub-Classes ................................... 19

COUNT ONE VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT
    (18 U.S.C. § 1030 *ET SEQ.*) ............................................................ 19

COUNT TWO  VIOLATION OF THE CALIFORNIA COMPUTER DATA
    ACCESS AND FRAUD ACT (CAL. PENAL CODE § 502, *ET SEQ.*) ......................... 22

COUNT THREE  VIOLATIONS OF THE CALIFORNIA UNFAIR
    COMPETITION LAW (CAL. BUS. & PROF. CODE § 17200, *ET SEQ.*) ................... 25

COUNT FOUR  TRESPASS TO CHATTEL ............................................................ 26

    B.    Claims brought on behalf of the Illinois Sub-Class ............................... 27

COUNT ONE  TRESPASS TO CHATTEL ............................................................ 27

    C.    Claims brought on behalf of the Michigan Sub-Class ........................... 28

COUNT ONE TRESPASS TO CHATTEL ............................................................ 28

    D.    Claims brought on behalf of the Washington Sub-Class ...................... 29

COUNT ONE  TRESPASS TO CHATTEL ............................................................ 29

PRAYER FOR RELIEF ............................................................................... 30

DEMAND FOR JURY TRIAL ........................................................................ 31

Plaintiffs David Bui-Ford, Igor Kravchenko, Micah Siegal, and Lucas Butler (collectively, "Plaintiffs") bring this action, on behalf of themselves and all others similarly situated, against defendant Tesla, Inc. (d/b/a Tesla Motors, Inc.) ("Tesla" or "Defendant").  Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information learned to date through investigations, except as to the allegations specifically pertaining to individual Plaintiffs, which are based on personal knowledge:

## I. INTRODUCTION

1. When car owners purchase their vehicles, they reasonably expect that unforeseen events—like weather, accidents, or flat tires—may impact the performance of their vehicles and lead to costly repairs.  But no reasonable consumer would expect that the car manufacturer itself, through an automated system, would deliberately and significantly interfere with the car's performance through software updates that reduce the operating capacity of the vehicles.

2. But that is precisely what Tesla has done here.  In the Tesla Model S and Model X vehicles (the "Class Vehicles"), Tesla recently has been implementing automatic software updates which, without warning to the customer, deplete the battery and reduce the driving range of the vehicles by at least 20%.  These updates are implemented by Tesla via entry into the car's computer, and are done systemically without the need to bring the car into a dealership for a repair.  In many cases, car owners will be compelled to pay a third party a significant fee ($500-$750) to reverse the software update so that the car owners could continue to experience the battery performance they had before the update.  In some other cases, the software updates will render the batteries inoperable, and car owners need to purchase a new battery at a cost of up to $15,000.

3. Even as Tesla is pushing out this software update to unsuspecting customers, it is denying any causal link between the software updates and the derating of the battery when car owners ask Tesla for assistance or repair following the updates.  But Class Vehicle owners know better.  Every named Plaintiff in this case experienced either a significant drop in battery capacity following a software update, or a complete battery shutdown.  Vehicle owners also receive an error message, "BMS_u029," which indicates that their battery is depleted or inoperable.

4.      Class members are particularly vulnerable to Tesla and its decisions to unilaterally impose software updates on customers.  Tesla owners connect to Tesla directly via Wi-Fi from their homes or businesses, and Tesla can then push software updates onto the vehicles, without the opportunity to consent to the updates or ask questions about the updates.  And Plaintiffs certainly did not consent to updates that harm the performance of their vehicles.  The only notice customers apparently receive is the following message:



5.      Tesla also advises used car purchasers to perform a factory reset upon purchase. With the reset to its factory settings, Tesla then pushes out a software update, which again derates

the performance of the battery or, in some cases, renders the battery inoperable.  At no point during the process does Tesla warn drivers that software updates pushed onto the vehicles will result in the depletion of battery life, which—according to Tesla, are designed to last the life of the vehicle.[1]

6.     Each of the named Plaintiffs is not bound by Tesla's draconian arbitration clause. The Plaintiffs have either purchased their vehicles in a private sale from third parties not affiliated with Tesla, or did not have a purchase agreement with an arbitration clause.

7.     Plaintiffs accordingly bring this action, on behalf of themselves and those similarly situated, to seek relief for the injuries and monetary damages they have sustained as a result of Defendant's unlawful conduct described herein.  Plaintiffs assert claims on behalf of a nationwide Class (or in the alternative on behalf of the State Sub-Classes) for violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.* ("CFAA"), California's Computer Data Access and Fraud Act, Cal. Penal Code § 502, *et seq.* ("CDAFA"), California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 ("UCL"), and trespass to chattel under California law.  Plaintiffs also bring claims for the common law tort of trespass to chattel under the laws of Illinois, Michigan, and Washington State on behalf of state-specific Sub-Classes.  Plaintiffs seek recovery on behalf of the Class and Sub-Classes for all relief to which they are entitled, including but not limited to compensation for out-of-pocket and incidental expenses, including compensation for Tesla owners who paid to replace their battery or to reverse the software updates, punitive damages, and an injunction compelling Tesla to stop unilaterally updating software or modifying the performance of their vehicles without their consent.

---

[1] *See* Tesla, *Impact Report 2019* at 13 (2019), https://www.tesla.com/ns_videos/2019-tesla-impact-report.pdf.

## II.     PARTIES

**A.     Plaintiffs**

### 1.     California Plaintiff

8.      Plaintiff David Bui-Ford is a resident of Menlo Park, California.  On February 2, 2022, Plaintiff Bui-Ford purchased a used MY 2013 Tesla Model S P85+ from a private seller in San Jose, California, for $30,000.

9.      On September 19, 2022, Plaintiff Bui-Ford received notice from Tesla that his Tesla vehicle was going to receive a software update, but Tesla did not tell him what the update was for or the effect on his battery life. The software update occurred at or near his residence in San Jose, California.  At no point was Plaintiff Bui-Ford provided the option to decline the software update.  On or about September 24, 2022, Plaintiff Bui-Ford received the "BMS_u029" error message.  On that same day, Plaintiff Bui-Ford noted that his vehicle's battery range was reduced from 270 miles per charge to 80 miles per charge.  On October 20, 2022, Plaintiff Bui-Ford brought his Tesla to an auto shop in San Jose, California.  This auto shop was able to undo the software update and fix the "BMS_u029" battery error through what the auto shop described as a "software reset."  The auto shop subsequently scanned the battery and found no error. Plaintiff Bui-Ford had to pay $500 for this repair.  Several days following this reset, Plaintiff Bui-Ford noted that his Tesla's battery range was back up to 270 miles when fully charged.

### 2.     Illinois Plaintiff

10.      Plaintiff Igor Kravchenko is a resident of Wheeling, Illinois.  On December 29, 2021, Plaintiff Kravchenko purchased a new Tesla Model S from a Tesla showroom in Highland Park, Illinois, for $101,490.  Plaintiff Kravchenko does not believe he received a sales agreement with a binding arbitration clause.  Plaintiff Kravchenko has noticed that the battery capacity has drained following a series of software updates, which occurred at or near his residence in Wheeling, Illinois. In particular, a year ago Plaintiff Kravchenko would notice an average daily battery drain of between 4-5% during very cold days, and a drain of 1-2% on other days.  But now, following software updates, he experiences a 8% battery drain even during moderate temperatures.

11. Tesla never asked for his consent to perform these specific software updates, and never told him about the effects of software updates on battery performance.

### 3. Michigan Plaintiff

12. Plaintiff Micah Siegal is a resident of Meridian Township, Michigan. On March 1, 2022, Plaintiff Siegal purchased a used Tesla Model S from a private seller in Chicago, Illinois, for approximately $69,000. Since his purchase, he has experienced at least a dozen software updates, which mainly occurred at or near his residence in Meridian Township, Michigan. Following these software updates, Plaintiff Siegal has noticed at least a modest drop in the stated/estimated capacity of the battery.

13. Tesla never asked for his consent to perform these specific software updates, and never told him about the effects of software updates on battery performance.

### 4. Washington Plaintiff

14. Plaintiff Lucas Butler is a resident of Graham, Washington. On February 13, 2022, Plaintiff Butler purchased a used 2013 Tesla Model S P85+ from a Dodge Chrysler Jeep showroom in Renton, Washington, for approximately $44,600. On or about March 19, 2023, Plaintiff Butler received notice from Tesla that his Tesla vehicle was going to receive a software update, but Tesla did not tell him what the update was for or the effect on his battery life. He received the software update at or near his residence in Graham, Washington. At no point was Plaintiff Butler provided the option to decline the software update. The next day (on March 20, 2023), Plaintiff Butler's vehicle would not turn on. Plaintiff Butler had the vehicle towed to a Tesla showroom, which told him that he needed to replace the battery. The showroom quoted him $20,798.56 to replace the battery and component parts. He currently has no charge on his battery. Prior to the software update, Plaintiff Butler's battery range was approximately 255 miles per charge; now he is unable to operate the vehicle.

### B. Defendant

15. Defendant Tesla, Inc. d/b/a/ Tesla Motors, Inc. is a Delaware corporation, with its nominal headquarters recently changed to Austin, Texas. Tesla is an auto manufacturer of electric vehicles and designs, manufactures, markets, distributes, and sells exclusively electric vehicles.

Since 2012, Defendant Tesla designed, manufactured, distributed, marketed, and sold the Class

Vehicles in the United States, with a large concentration of the Class Vehicles being sold in the

State of California.

16.     Tesla has long-standing roots in California.  Tesla was founded in 2003 in San

Carlos, California,[2] and in 2009 it moved its headquarters to Palo Alto, California.[3]  In May 2010,

Tesla purchased a factory from Toyota in Fremont, California, which would later be known as the

Tesla Factory.[4]  Tesla opened the factory five months later to start production of the Model S.

Although Tesla nominally moved its headquarters to Austin on December 1, 2021, the CEO of

Tesla, Elon Musk, stated it would continue its operations in the Fremont factory, and would

continue to expand in California.[5]  As Mr. Musk explained, "there's a limit how big you can scale

it in the Bay Area.  Just to be clear, though, we will be continuing to expand our activities in

California.  This is not a matter of leaving California."  *Id.*

17.     Consistent with this statement, in September 2021, Tesla broke ground on a

battery "megafactory" in Lathrop, California,[6] and in October 2021, signed a lease for additional

office space in Palo Alto.[7]  And in February 2023, Musk and California Governor Gavin Newsom

jointly announced a "global engineering headquarters" in Palo Alto, California.[8]  At the joint

event, Musk announced that "[w]e're excited to announce that Tesla's global engineering

---

[2] *See* Wikipedia, *Tesla, Inc.*,  https://en.wikipedia.org/wiki/Tesla,_Inc.#Automotive_products (last updated May 4, 2023).

[3] *See* Tracy Seipel & Scott Duke Harris, *Tesla moving headquarters and powertrain operations to Palo Alto*, THE MERCURY NEWS (updated Aug. 14, 2016), https://www.mercurynews.com/2009/08/17/tesla-moving-headquarters-and-powertrain-operations-to-palo-alto/.

[4] *See* Wikipedia, *supra* note 2.

[5] *See* Alex Veiga, *Elon Musk says Tesla will move HQ from California to Texas*, AP NEWS (Oct. 7, 2021), https://apnews.com/article/technology-business-palo-alto-elon-musk-austin-7a9b375a5b69c25564c9ae4dc4fba64e.

[6] *See* Aria Alamalhodaei, *Tesla's battery-manufacturing 'Megafactory' breaks ground in California*, TECHCRUNCH (Sept. 23, 2021), https://techcrunch.com/2021/09/23/teslas-battery-manufacturing-megafactory-breaks-ground-in-california/.

[7] *See* George Avalos, *Tesla agrees to big office lease in Palo Alto, despite HQ exit*, THE MERCURY NEWS (updated Oct. 12, 2021), https://www.mercurynews.com/2021/10/08/tesla-agrees-to-big-office-lease-in-palo-alto-despite-hq-exit/.

[8] *See* Dana Hull & Karen Breslau, *Newsom, Musk dedicate former HP headquarters in Palo Alto to Tesla engineers*, L.A. TIMES (Feb. 22, 2023), https://www.latimes.com/business/technology/story/2023-02-22/tesla-to-open-engineering-headquarters-in-palo-alto-california.

1    headquarters will be right here in the former headquarters of Hewlett-Packard. . . . This is a poetic

2    transition from the company that founded Silicon Valley to Tesla."[9]  In describing the software

3    and hardware work in California, he also stated "as I often say, Tesla is as much a software

4    company as it is a hardware company."[10]  Upon information and belief, at least some of the

5    decisions behind the software updates and responses to the software updates were made at the

6    engineering headquarters in Palo Alto, California.

7         18.    Tesla also regularly conducts business throughout the State of California and owns

8    and operates a system of company-owned showrooms and service centers within the jurisdiction

9    of this Court. On information and belief, through Tesla's publicly filed financial reports and its

10   website, Tesla designs, tests, and manufactures its vehicles, including the Class Vehicles, at its

11   factory in California and throughout the State of California.

12        19.    Tesla's authorized showrooms are highly regulated and controlled by Tesla and

13   function as agents of Tesla. In addition, Tesla sells the vehicles directly to consumers.  Tesla

14   controls the marketing practices of Tesla-authorized showrooms and Tesla repair and service

15   facilities, and has full rein over the appearance of these purported showrooms and service centers.

16        20.    At all times relevant to this action, Tesla marketed, distributed, advertised, leased,

17   sold, and warranted its vehicles, including the Class Vehicles, by and through its showrooms and

18   service centers located through nearly 60 locations in California (but only 22 in Texas).[11]

19                    **III.    VENUE AND JURISDICTION**

20        21.    This Court has original jurisdiction over the subject matter of this action pursuant

21   to 28 U.S.C. §§ 1331 & 1332. This Court also has supplemental jurisdiction over the state

22   law claims because those claims are integrally related to the federal claims and form part of the

23   same case and controversy under 28 U.S.C. § 1367.

24

25

26        [9] *Id.*

27        [10] *See* CNET Highlights, *Elon Musk's Remarks During Engineer HQ Debut* at 1:38, YOUTUBE (Feb. 23, 2023), https://www.youtube.com/watch?v=vl-Av28e0fo.

28        [11] *See* Tesla, *US Tesla Stores & Galleries*, https://www.tesla.com/findus/list/stores/United+States (last visited May 11, 2023).

CLASS ACTION COMPLAINT - 7
Case No. 3:23-cv-02321
011160-11/2247823 V1

22.     The Court also has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from Tesla, there are more than 100 Class members, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interests and costs.

23.     This Court has personal jurisdiction over Tesla by virtue of its transacting and doing business in this District and because Tesla is registered to do business in California.  Tesla was formerly headquartered in this District, and currently has its engineering headquarters in this District.  Upon information and belief, the decision-makers who are responsible for the unilateral software updates work in this District.  Tesla has transacted and done business in the State of California and in this District and has engaged in statutory violations and common law tortious conduct in this state and in this District.

24.     Venue is proper pursuant to 28 U.S.C. § 1391(a) & (b) because a substantial part of the events or omissions giving rise to the claims occurred in this District. Venue is proper pursuant to 18 U.S.C. § 1965(a) & (b) because Tesla transacts affairs in this District, and the ends of justice require it. Venue is also proper in this District under 28 U.S.C. § 1391(b)(3) because Tesla resides in this judicial District for venue purposes.

### IV.     FACTUAL ALLEGATIONS

**A.     Tesla routinely pushes out software updates for the Class Vehicles.**

25.     Tesla takes advantage of its wired customers and vehicles by routinely issuing software updates to the vehicles, without affirmatively asking for consent.  As Tesla's website states:[12]

## Software Updates

Tesla vehicles regularly receive over-the-air software updates that add new features and enhance existing ones over Wi-Fi.

---

[12] *See* Tesla, *Software Updates*, https://www.tesla.com/support/software-updates (last visited May 11, 2023).

26.     Under the "FAQ," Tesla's website states:[13]

⌄ **What are over-the-air software updates?**
Over-the-air software updates introduce new features and updates to your vehicle —making your vehicle safer and more capable over time.

27.     If a Tesla owner encounters difficulties as a result of the software (e.g., the battery performance diminishes), the customers are falsely told by Tesla that they cannot revert back to the previous software version:[14]

⌄ **How can I confirm which software version I have?**
To check the latest software version on your vehicle, tap 'Software' on your touchscreen. You can also see which version you have in the Tesla app. You current software version is listed under your VIN on the main page.

**Note:** It is not possible to revert your vehicle to a previous software version.

28.     Nor can a Tesla owner cancel the software update once it begins:

⌄ **Can I cancel a software update once it begins? How do I resume when I am ready?**
You cannot cancel a software update once it has started the install phase.

29.     According to Tesla, customers cannot stop software updates, cannot revert to previous software versions, and at no point elect to perform the software updates in the first instance.  At the same time, Tesla assures customers that these updates "add new features and enhance existing ones."  As illustrated below, this is demonstrably not true, and at no point did Tesla advise customers about the harmful effects of the software update on battery life.

**B.     Aftermarket software products confirm battery depletion.**

30.     In addition to the experiences of the named Plaintiffs, proof of the battery depletion condition is revealed in aftermarket software packages sold by third parties that reset the software update so that customers can revert back to the battery range they experienced prior to the update.  One such vendor, Hybrid ReVolt, explained as follows in its sales contract:

---

[13] *See id.* at Frequently Asked Questions ("What are over-the-air software updates?"), https://www.tesla.com/support/software-updates#tesla-accordion-v2-2223-what-are-the-air-software-updates (last visited May 11, 2023).

[14] *See id.* at Frequently Asked Questions ("How can I confirm which software version I have?"), https://www.tesla.com/support/software-updates#tesla-accordion-v2-2223-how-can-i-confirm-which-software-version-i-have (last visited May 11, 2023).

Here's the deal:  Hybrid ReVolt/Matthew Edwards (the "Seller") has successfully developed a hardware device that restores full charge ability (the "Device") for Tesla Model S and X vehicles that are experiencing a BMS_u029 error which limits the traction battery to roughly half charge.  The Seller has determined that there is a market among Tesla owners and mechanics to have access to the Device as developed by the seller. . . .

For a reason only known to Tesla, in roughly August of 2022, Tesla vehicles received a software update that could trigger a BMS_[u]029 error, which resulted in the vehicle being unable to fully charge.  Upon diagnosing BMS_u029, no known fault could be associated with the vehicle[']s battery pack.  Thus it is unclear as to why the BMS_u029 error is being triggered.  Tesla's solution is to replace the entire traction pack at a great expense.

31.     As part of its business, Tesla must know about this product, and must know that it is effective in resetting the software and restoring battery life.  But, as referenced above, Tesla falsely tells consumers that no such option exists.

**C.     Tesla represented that the battery would last the lifetime of the vehicle.**

32.     The depletion of batteries following software updates is completely inconsistent with Tesla's representations about battery life.  In fact, Tesla represents that its batteries will outlast the vehicles themselves.  Starting as early as 2019, in its Tesla Impact Report, it stated the following:[15]

> **Our batteries are designed to function for the entire life of the vehicle**
>
> Tesla's battery packs are designed to outlast the vehicle.  We estimate that a vehicle gets scrapped after approximately 200,000 miles of usage in the U.S. and roughly 150,000 miles in Europe.

33.     Tesla made the same representation, verbatim, in 2020[16] and 2021.[17]

34.     In 2022, Tesla's "Impact Report" stated the following:

> We often get asked:  Will I need to replace my battery at some point in the future?

---

[15] *See* Impact Report 2019, *supra* note 1, at 13.

[16] *See* Tesla, *Impact Report 2020* at 22 (2020), https://www.tesla.com/ns_videos/2020-tesla-impact-report.pdf.

[17] *See* Tesla, *Impact Report 2021* at 67 (2021), https://www.tesla.com/ns_videos/2021-tesla-impact-report.pdf.

> The answer is no.  Since we've been selling EVs for over a decade, we have a reliable data set that shows us battery degradation over time.
>
> We estimate that a vehicle gets scrapped after approximately 200,000 miles of usage in the U.S. and roughly 150,000 miles in Europe.
>
> Even after 200,000 miles of usage, our batteries lose just 12% of their capacity on average.[18]

35.    Plaintiffs are not citing to these representations in support of claims that Tesla fraudulently induced sellers into their purchase at the point of sale.  Instead, these representations demonstrate that Tesla understood that battery life is material to consumers, and that Tesla's reputation is built in part on the longevity of their batteries.  During pre-release testing, Tesla must have learned that its software updates would diminish customers' battery life (or render the batteries inoperable).  Tesla accordingly acted intentionally in pushing out software updates that diminished the Class Vehicles' battery life without the consent of the user.

**D.    Tesla knew about the effect of software updates from public complaints.**

**1.    Tesla has known about the effect of software updates based on its own monitoring of the industry.**

36.    Tesla must have known about the harmful effects of the software updates from an array of sources, including its pre-release and post-release monitoring data and complaints made on internet forums.

37.    It is standard practice for automobile manufacturers such as Tesla to engage in extensive pre- and post-launch testing of their vehicles. This design, engineering, and testing data is unavailable to Plaintiffs without discovery, but upon information and belief, analysis of this data most likely would have revealed the battery issues that follow software updates.

38.    Tesla routinely monitors the internet for consumer complaints. Tesla also collects and analyzes field data including, but not limited to, repair requests made at showrooms and service centers, part sales reports, and reports prepared that have reviewed vehicles for which warranty coverage is requested.

---

[18] *See* Tesla, *Impact Report 2022* at 39 (2022), https://www.tesla.com/ns_videos/2022-tesla-impact-report.pdf.

CLASS ACTION COMPLAINT - 11
Case No. 3:23-cv-02321
011160-11/2247823 V1

39.     Tesla also knew about this condition because Tesla Roadside and its customer services department review and receive complaints from customers and can identify potentially widespread vehicle problems and assist in diagnosing vehicle issues. This is evident because, as the following section reveals, multiple customers mention contacting Tesla roadside when they are experiencing issues.

**2.     Complaints on publicly available internet forums and blogs show that Tesla knows about battery depletion following software updates.**

40.     Based on its commercial interests and its duty to monitor safety-related complaints or concerns, Tesla assuredly saw consumer complaints regarding the battery defect following software updates.  There are many complaints posted on consumer forums by owners of the Class Vehicles. The following is a sampling of internet complaints for the Class Vehicles, which go back for years (all typos in original):

- I ran a software update this morning. About 45 minutes later I went to the car to leave for work, and it is dead. I can unlock the doors and open the charger port via the app. Nothing else is working. I created a mobile appt, but that is for 2 weeks out.

  Anyone have any suggestions? Is there a number I can call? Does roadside assistance bring Tesla service? I can't wait 2 weeks.

  Thanks!
  Dan Wassink[19]

- Had tried to do the latest software update a few times and errors kept happening. Called Tesla and they advised doing a reset.

  did the reset and the screen goes blank and then nothing. I had the AC on max prior to doing the reset and the AC been running strong now for 12 hours but the car won't do anything.

  tried all resets and no luck. Just dead in the water…..

  ADVICE: never do a software reset in a location that would be difficult to get towed from….my car was 45% charged and no other issues.[20]

- While the car was plugged in for routine charging overnight (battery was at ~30%), a software update occurred. In the morning I saw the 'software update completed' notification. When I pressed the handle of the passenger side door, it opened a crack, but after that the car went dead: didn't respond to the key, nor could the app talk to it.

---

[19] Dan Wassink, *Model 3 is dead. Ran software Update this morning. Now I get nothing.*, TESLA MOTORS CLUB (July 23, 2020, post #1), https://teslamotorsclub.com/tmc/threads/model-3-is-dead-ran-software-update-this-morning-now-i-get-nothing.200921/.

[20] RcsMD, *Software rest and then dead*, TESLA MOTORS CLUB (Aug. 11, 2021, post #1), https://teslamotorsclub.com/tmc/threads/software-reset-and-then-dead.236719/.

Roadside assistance sent a tow truck. After jump starting the 12V battery for just a minute or so the attached errors and warnings popped up. Couple of minutes later I was able to start the car and back it out of the garage. It's at service right now, but I am curious if the gurus on this forum have seen anything similar or have any insights. Thank you![21]

- Dear folks,

  Since doing the software update last week, my December 2019 Model XLR has started losing about 12-14 miles of charge per day just sitting idle. Something seems to be eating 100 W or so of power, continuous, that wasn't before. Before the update, I'd lose 2-4 miles per day, just sitting.

  I haven't changed any of the car settings — sentry is on, climate is off. It doesn't seem sensitive to external temperature or weather conditions.

  It's not fatal, but it is irritating. Any idea what might be going on?

  pax / Ctein[22]

- I have a 2020 Standard Plus Model 3.

  Shortly after installing the latest software update, I went out to my Model 3 to discover the following issues:

  - Driver side door won't open from inside or outside

  - Charge port wouldn't unlock so I had to unlock it manually

  - Vehicle won't start

- Alert on the screen saying to "Schedule service to replace low voltage battery. Software will not update until battery is replaced."

  I contacted Tesla Roadside. It's Christmas Eve and now I'm waiting for a tow truck to come tow my vehicle to the nearest Tesla Service Center.

  Has anyone else had this issue? Does it sound like a software update issue, battery issue, or both?[23]

---

[21] srflipflop, *Car dead after successful software update*, TESLA MOTORS CLUB (Sept. 9, 2022, post #1), https://teslamotorsclub.com/tmc/threads/car-dead-after-successful-software-update.279487/.

[22] Ctein, *Discharge at rest increased after software update*, TESLA MOTORS CLUB (Mar. 24,2020, post #1), https://teslamotorsclub.com/tmc/threads/discharge-at-rest-increased-after-software-update.189329/.

[23] todda_88, *Issues after latest Software Update [dec 2021]*, TESLA MOTORS CLUB (Dec. 24, 2021, post #1), https://teslamotorsclub.com/tmc/threads/issues-after-latest-software-update-dec-2021.251019/.

- I was either on n2021.4.3 or just updated to it and now my car won't start. I am beyond annoyed - they ought to have a clean rollback approach if there's an issue with an update. Anyone else having issues?[24]

- Hello. I have a new Tesla Model 3 long range. I just got it in August. So far I've had no problems. However, after the last software update to version 2022.24.8, I noticed that the battery drain when it is parked in the garage seems to be a lot. For instance, before the update, I could go to work and park in the hot Florida sun for 10+ hours and not lose any percent of my battery. I don't use Sentry Mode or Cabin Overheat protection. However, after the new update, I am losing 2-3% in a couple of hours while it is parked in the garage. It also seems like there is a humming sound from the front. It doesn't seem like a fan, but I don't know. I've only had the car a month. I never had a problem with battery drain until now. Has anybody else noticed this? Thanks.[25]

- A Redditt thread titled "After software update 2021.32.31 car will no longer drive:" The owner provided five updates and update 4 stated that Advanced Tesla Support Team was able to push down a firmware update. I tried to install it but it failed. There was an error message on my Car saying: Unable to start the software update because there is an issue related to the 12v battery and/or low voltage electrical system. Check for related alerts and resolve before retrying the update." I sent them the picture of the error message and A few moments later I got a text back from Tesla Support and they said they are unable to resolve the issue remotely. So I need to have it towed and **probably just have the 12v battery replaced. Unfortunately the tow is $300 because this isn't covered.** So I've agreed to pay and will just bill it to my insurance. Just waiting on the tow truck.[26]

- The article states that when a software update that the company pushed out in May to address a potential fire risk in some Tesla models ended up also cutting into how far he could drive without needing to recharge the battery pack and making the recharging process take longer. **After the May 15 update, Perez says the maximum range on his electric car suddenly fell from 255 miles to as few as 221 miles**.[27]

- Over the last week, we received several reports from Tesla owners about seeing significant drops in range from 12 to 30 miles over a short period of time … for most owners, the range drop happened after updating to Tesla's 2019.16.1 and .2 software updates.[28]

---

[24] Sid the Kid, *Car wont start after software update*, TESLA MOTORS CLUB (Feb. 12, 2021, post #1), https://teslamotorsclub.com/tmc/threads/car-wont-start-after-software-update.220433/.

[25] Michael_79, *Battery drain after 2022.24.8 Software update?*, TESLA MOTORS CLUB (Sept. 10, 2022, post #1), https://teslamotorsclub.com/tmc/threads/battery-drain-after-2022-24-8-software-update.279595/.

[26] Kenshinryu, Comment to *After software update 2021.32.31 car will no longer drive*, REDDIT (last updated Nov. 10, 2021), https://www.reddit.com/r/teslamotors/comments/qog4gt/after_software_update_20213231_car_will_no_longer/.

[27] Stephanie Zimmermann, *Tesla's disappearing miles: Owners say automatic software fix has had unwanted side effects*, CHICAGO SUN-TIMES (Oct. 18, 2019), https://chicago.suntimes.com/2019/10/18/20919396/tesla-batteries-software-update-electric-car-fires-range-lawsuit-consumers-guillermo-perez-chicago.

[28] Fred Lambert, *Tesla owners see battery range drop after software update to 'improve longevity'*, ELECTREK (June 20, 2019), https://electrek.co/2019/06/20/tesla-battery-range-drop-software-update-longevity/.

**E.      Prior litigation demonstrate Tesla knows software updates diminish battery performance.**

41.      Notwithstanding its denials today, Tesla previously had impliedly acknowledged that software updates can and do lead to battery depletion.  On August 7, 2019, a plaintiff filed suit in this District against Tesla, alleging that its software updates led to decreased performance. The complaint specifically alleged that Tesla defrauded customers by "placing an artificial, software induced limitation on the total number of usable kilo-watt hours ('kWh') for the Class Vehicles, in other words, limiting the maximum capacity of the Class Vehicles, by limiting the ability of owners of the Class Vehicles to charge the battery cells up to the natural and normal amount of approximately 4.2 volts, by placing a battery capacity limitations, by decreasing the charging speed for the Class Vehicles, and by reducing the performance in terms of speed and other factors for the Class Vehicles."[29]

42.      In response to this Complaint, Tesla did not even bother to challenge the allegations:  the parties moved almost immediately to settlement discussions.[30]  The parties moved for approval of a settlement class, as follows:[31]

> All United States residents who, anytime during the period from May 15, 2019 through September 1, 2020, owned or leased a Tesla Model S vehicle that experienced a limitation of maximum battery voltage as the result of the software update issued by Tesla in May 2019.

43.      In a supporting declaration from Tesla's outside counsel, Sean P. Gates, Tesla admitted that "Data from Tesla shows that 1,743 2012-2016 Model S vehicles in the United States were subject to a 10% voltage limitation caused by a May 2019 software update."[32] However, according to Mr. Gates, a "subsequent update in July 2019 restored about 3% of the battery voltage in these vehicles," and—after the *Rasmussen* action was filed—"a third update

---

[29] *See* Class Action Complaint at ¶ 6, *Rasmussen v. Tesla, Inc.*, 19-cv-04596 BLF (N.D. Cal. Aug. 7, 2019), ECF No. 1.

[30] *See* Stip. & [Proposed] Order to Stay Case Pending Mediation, *Rasmussen v. Tesla, Inc.*, 19-cv-04596 BLF (N.D. Cal. Oct. 28, 2019), ECF No. 18.

[31] *See* Pls.' Mem. of P. & A. in Supp. of Mot. for Prelim. Approval of Class Settlement and Direction of Notice under Rule 23(E) at 3, *Rasmussen v. Tesla, Inc.*, 19-cv-04596 BLF (N.D. Cal. July 28, 2021), ECF No. 49.

[32] *See* Decl. of Sean P. Gates in Supp. of Pl.'s Mot. for Prelim. Approval of Class Settlement at ¶ 2, *Rasmussen v. Tesla, Inc.*, 19-cv-04596 BLF (N.D. Cal. July 28, 2021), ECF No. 49-4.   .

1  released in March 2020 is designed to fully restore the batteries' voltage over time as the vehicles

2  are driven."[33]  Under the terms of the settlement, Tesla agreed to pay each class member $625.[34]

3       44.     On June 6, 2022, the court granted final approval of the settlement, including

4  certification of the settlement class.[35]

5                    **V.     CLASS ACTION ALLEGATIONS**

6       45.     Plaintiffs bring this action on behalf of themselves and as a class action, pursuant

7  to the provisions of Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of

8  the class of persons (collectively, the "Class") who purchased or leased one or more of the Class

9  Vehicles (Tesla Model S and Model X).

10      46.     Plaintiffs bring this action on behalf of themselves and as a class action, pursuant

11 to Federal Rule of Civil Procedure 23, on behalf of the following Class and Sub-Classes:

12      **Nationwide Class**: All persons or entities who purchased or leased one or more of the
        Class Vehicles.

13

14      **California Sub-Class**: All persons or entities who purchased or leased one or more of the
        "Class Vehicles" in the State of California.

15      **Illinois Sub-Class**:  All persons or entities who purchased or leased one or more of the
        "Class Vehicles" in the State of Illinois.

16

17      **Michigan Sub-Class**:  All persons or entities who purchased or leased one or more of the
        "Class Vehicles" in the State of Michigan.

18      **Washington Sub-Class**: All persons or entities who purchased or leased one or more of
        the "Class Vehicles" in the State of Washington.

19

20      47.     Excluded from the Class are Tesla and its officers, directors, affiliates, legal

21 representatives, employees, co-conspirators, successors, subsidiaries, and assigns, as well as any

22 entity in which Tesla has a controlling interest. In addition, governmental entities and any judge,

23 justice, or judicial officer presiding over this matter and the members of their immediate families

24 and judicial staff are excluded from the Class. Plaintiffs reserve the right to revise the Class

25 definition based upon information learned through discovery.

26 ────────────────
       [33] *Id.* ¶ 3.

27     [34] Pls.' Mem., *supra* note 31, at 4.

28     [35] *See* Final Approval Order at 4-5, *Rasmussen v. Tesla, Inc.*, 19-cv-04596 BLF (N.D. Cal.
   June 21, 2022), ECF No. 64.

48.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

49.     The Class Representatives are asserting claims that are typical of claims of their respective Classes, and they will fairly and adequately represent and protect the interests of the Classes in that they have no interests antagonistic to those of the putative Class members.

50.     The amount of damages suffered by each individual member of the Class, in light of the expense and burden of individual litigation, would make it difficult or impossible for individual Class members to redress the wrongs done to them. Plaintiffs and other members of the Classes have all suffered harm and damages as a result of Tesla's unlawful and wrongful conduct. Absent a class action, Tesla will likely not have to compensate victims for Tesla's wrongdoings and unlawful acts or omissions, and will continue to commit the same kinds of wrongful and unlawful acts or omissions in the future.

51.     **Numerosity under Federal Rule of Civil Procedure 23(a)(1)**: The members of the Class are so numerous that individual joinder of all of its members is impracticable. Due to the nature of the trade and commerce involved, Plaintiffs believe that the total number of Class Plaintiffs is at least in the tens of thousands, and are numerous and geographically dispersed across the country. While the exact number and identities of the Class members are unknown at this time, such information can be ascertained through appropriate investigation and discovery, as well as by the notice Class members will receive by virtue of this litigation so that they may self-identify. The disposition of the claims of Class members in a single class action will provide substantial benefits to all Parties and the Court. Members of the Class may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

52.     **Commonality and Predominance under Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3)**: This action involves common questions of law and fact which predominate over any questions affecting individual Class members, including, without limitation:

1      a.     Whether Tesla engaged in the conduct alleged herein;

2      b.     Whether Tesla knew about the effect of software updates on battery performance,

3 and if so, how long Tesla knew or should have known as much;

4      c.     Whether Tesla designed, advertised, marketed, distributed, leased, sold, or

5 otherwise placed the Class Vehicles into the stream of commerce in the United States;

6      d.     Whether Tesla omitted material facts about the quality and durability of the

7 batteries in the Class Vehicles;

8      e.     Whether Tesla's conduct violates the CFAA, the CDAFA, the UCL, and

9 constitutes trespass to chattel under applicable common law;

10     f.     Whether Tesla misrepresented the truth to consumers when it advised them that

11 the software updates cannot be undone; and

12     g.     Whether Plaintiffs and the other Class members are entitled to damages and other

13 monetary relief and, if so, what amount.

14     53.    **Typicality under Federal Rule of Civil Procedure 23(a)(3)**: Plaintiffs' claims

15 are typical of the other Class members' claims because all have been comparably injured through

16 Tesla's wrongful conduct as described above.

17     54.    **Adequacy of Representation under Federal Rule of Civil Procedure 23(a)(3)**:

18 Plaintiffs are adequate Class representatives because their interests do not conflict with the

19 interests of the other Class members they seek to represent. Additionally, Plaintiffs have retained

20 counsel with substantial experience in handling complex class action and multi-district litigation.

21 Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the

22 Class and have the financial resources to do so. The interests of the Class will be fairly and

23 adequately protected by Plaintiffs and their counsel.

24     55.    **Superiority of Class Action under Federal Rule of Civil Procedure 23(b)(3)**: A

25 class action is superior to any other available means for the fair and efficient adjudication of this

26 controversy, and no unusual difficulties are likely to be encountered in the management of this

27 class action. The financial detriment suffered by Plaintiffs and the other members of the Class are

28 relatively small compared to the burden and expense that would be required to individually

1  litigate their claims against Tesla's wrongful conduct. Even if members of the Class could afford

2  individual litigation, the court system could not. Individualized litigation creates a potential for

3  inconsistent or contradictory judgments and increases the delay and expense to all parties and the

4  court system. By contrast, the class action device presents far fewer management difficulties and

5  provides the benefits of single adjudication, economy of scale, and comprehensive supervision by

6  a single court.

7  ### VI.   CAUSES OF ACTION

8  **A.   Claims brought on behalf of the Nationwide Class, or in the alternative, on behalf of
9  the Sub-Classes**

10  <u>**COUNT ONE**</u>

11  **VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT
(18 U.S.C. § 1030 *et seq.*)**

12  56.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set

13  forth herein.

14  57.    Plaintiffs bring this count on their own behalf and on behalf of the Nationwide

15  Classes. In the alternative, Plaintiffs bring this count on their own behalf and on behalf of the

16  State Sub-Classes.

17  58.    The federal Computer Fraud and Abuse Act ("CFAA") establishes a private cause

18  of action against a person who "knowingly accessed a computer without authorization or

19  exceeding authorized access," and whose prohibited access results in damage or loss in excess of

20  $5,000 in any one-year period.  18 U.S.C. § 1030(a)(4).

21  59.    The CFAA also establishes liability against whomever: "knowingly causes the

22  transmission of a program, information, code or command, and as a result of such conduct,

23  intentionally causes damage without authorization to a protected computer" (§ 1030(a)(5)(A));

24  "intentionally accesses a protected computer without authorization, and as a result of such

25  conduct, recklessly causes damage" (§ 1030(a)(5)(B)); or "intentionally accesses a protected

26  computer without authorization, and as a result of such conduct, causes damage and loss"

27  (§ 1030(a)(5)(C)).

28

60.    The term "computer" means "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device[.]" 18 U.S.C. § 1030(e)(1).

61.    A "protected computer" is defined, in relevant part, as a computer "which is used in or affecting interstate or foreign commerce or communication." 18 U.S.C. § 1030(e)(2)(B).

62.    "[E]xceeds authorized access" means "access[ing] a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled to obtain or alter." 18 U.S.C. § 1030(e)(6).

63.    "Loss" means "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11).

64.    Damage means "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8).

65.    The term "person" means "any individual, firm, corporation, educational institution, financial institution, governmental entity, or legal or other entity." 18 U.S.C. § 1030(e)(12).

66.    The Class Vehicles are "computers" under the CFAA by virtue of Tesla's vehicles containing Media Control Units (MCUs) which provide data processing, GPS, and communication functions, amongst others, and serve as the receiving end of Tesla's over-the-air software updates.

67.    The Class Vehicles are also "protected computers" under the CFAA because they are used in and affect interstate and foreign commerce and communication, including through contact and communication with remote servers, personal and business usages that affect interstate and foreign commerce, and because Tesla's vehicles are powered and maintained by computers which ensure that Tesla vehicles can operate and drive in furtherance of the stream of interstate and foreign commerce.

68.     Tesla pushed software updates to the computers in the Class Vehicles without informing Plaintiffs and the putative Class members that the updates contained code that would diminish performance and lower the maximum amount of usable battery capacity. Plaintiffs and the other putative Class members did not give permission for Tesla to install the updates, including consenting to updates that would harm the performance of their vehicles, and Tesla was not authorized to do so, as Tesla failed to provide material information to Plaintiff and the putative Class members regarding the updates.

69.     Tesla violated 18 U.S.C. § 1030(a) by knowingly causing the transmission of vehicle software updates to Plaintiffs' and the putative Class members' vehicles to access, collect, and transmit information to vehicles, which are protected computers as defined above. By transmitting information and software updates to the vehicles, Tesla intentionally caused damage without authorization, or at the very least, exceeded the authorized access to Plaintiffs' and the other putative Class members' vehicles by impairing the ability of the vehicles to operate as warranted, represented, and advertised by Tesla.

70.     Tesla knowingly and intentionally exceeded its authorized access to Plaintiffs' and the other putative Class members' vehicles. Plaintiffs and the other putative Class members did not consent to Tesla's manipulations with their vehicles Battery Management Systems, nor did Plaintiffs and the other putative Class members consent to Tesla limiting the maximum charge voltage and usable amount of battery capacity which lead to significant amounts of range loss and loss of performance in these vehicles.

71.     By exceeding its authorized access, Tesla obtained and altered the information and function of the Class Vehicles, and failed to inform Plaintiffs and other owners of the Class Vehicles of the reduced battery capacity and software limited charging capabilities. Tesla did so with an intent to defraud Plaintiffs and the other putative Class members and furthered the fraudulent intent to avoid its duties and legal obligations to provide Plaintiffs and the putative Class members with battery replacements under warranty. The cost of an out-of-pocket battery replacement exceeds $5,000, and therefore Tesla's fraudulent intent and conduct as alleged herein constitutes a violation of 18 U.S.C. § 1030(a)(4).

72.     Tesla's acts have also caused actual monetary loss in terms of lost battery capacity. Plaintiffs and putative Class members were compelled to pay a third party to uninstall Tesla's software updates so that they could experience the same level of battery performance as they had prior to the software update.

73.     As alleged above and herein, Tesla knowingly caused the transmission of "a program, information, code, or command . . . to a protected computer" and as a result of that conduct, intentionally caused damage to Plaintiffs and the putative Class. 18 U.S.C. § 1030(a)(5)(A).

74.     Tesla's software updates caused damage and loss to Plaintiff and other putative Class members, including a significant decrease in range and usable battery capacity, impairment of Plaintiffs' and the other putative Class members' ability to use their own property, forcing Plaintiffs and the other putative Class members to expend time, money, and labor in connection with their vehicles and to investigate and determine what the right fix would be for the Class Vehicles. Tesla caused damages and loss to Plaintiffs and the putative Class members during a one-year period that exceeds $5,000 in value in the aggregate.

75.     Unless Tesla is retrained and enjoined, Tesla will continue to commit such acts. Plaintiffs' remedy at law is thus inadequate to compensate for these intentionally inflicted and threatened injuries, therefore entitling Plaintiffs and the putative class to remedies including injunctive relief as provided for by § 1030(g).

76.     Therefore, Plaintiffs and the putative Class members are entitled to obtain compensatory damages, injunctive relief, or other equitable relief as provided under 18 U.S.C. § 1030(g).

## COUNT TWO

### VIOLATION OF THE CALIFORNIA COMPUTER DATA ACCESS AND FRAUD ACT
(Cal. Penal Code § 502, *et seq*.)

77.     Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

CLASS ACTION COMPLAINT - 22
Case No. 3:23-cv-02321
011160-11/2247823 V1

78.     Plaintiffs bring this count on their own behalf and on behalf of the Nationwide Classes. In the alternative, Plaintiffs bring this count on their own behalf and on behalf of the State Sub-classes.

79.     The California Computer Data Access and Fraud Act, California Penal Code § 502 ("CDAFA"), regulates "tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems."

80.     Pursuant to Cal. Penal Code § 502(b):

(1) "Access" means to gain entry to, instruct, or communicate with the logical, arithmetical, or memory function resources of a computer, computer system, or computer network.

(2) "Computer network" means any system that provides communications between one or more computer systems and input/output devices including, but not limited to, display terminals and printers connected by telecommunication facilities.

(3) "Computer program or software" means a set of instructions or statements, and related data that, when executed in actual or modified form, cause a computer, computer system, or computer network to perform specified functions.

(4) "Computer services" includes, but is not limited to, computer time, data processing, or storage functions, or other uses of a computer, computer system, or computer network.

81.     Cal. Penal Code § 502 provides: "For purposes of bringing a civil or a criminal action under this section, a person who causes, by any means, the access of a computer, computer system, or computer network in one jurisdiction from another jurisdiction is deemed to have personally accessed the computer, computer system, or computer network in each jurisdiction."

82.     Cal. Penal Code § 502(e) provides a civil cause of action for compensatory damages, injunctive relief, or other equitable relief, to "the owner or lessee of the computer, computer system, computer network, computer program, or data who suffers damage or loss by reason of a violation" of the CDAFA.

83.     The Class Vehicles are part of a "computer system" and provide "computer services" because the Class Vehicles contain Media Control Units (MCUs), which provide data processing, GPS, the ability to send and receive communications, and other functions, and serve as the receiving end of Tesla's over-the-air software updates.

84.     A violation of section 502(c)(3) occurs when any person "[k]nowingly and without permission uses or causes to be used computer services."

85.     A violation of section 502(c)(4) occurs when any person "[k]nowingly accesses and without permission adds, alters, damages, deletes, or destroys any data, computer software, or computer programs which reside or exist internal or external to a computer, computer system, or computer network."

86.     A violation of section 502(c)(7) also occurs when any person "[k]nowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network."

87.     Defendant has violated California Penal Code § 502 by knowingly accessing, copying, using, making use of, interfering, and/or altering data belonging to Plaintiffs: (1) in and from the State of California; (2) in the home states of the Plaintiffs; and (3) in the state in which the servers that provided the communication link between Plaintiffs and the websites they interacted with were located.

88.     Defendant has violated California Penal Code § 502 by knowingly and intentionally causing the transmission of vehicle software updates to Plaintiffs' Class Vehicles, thereby intentionally causing damage without authorization, or, at the very least, exceeding Tesla's authorization to access the Class Vehicles.

89.     Tesla knowingly and intentionally exceeded its authorized access to the Class Vehicles.  Plaintiffs and other putative Class members did not consent to Tesla's manipulation of the software controlling the batteries in the Class Vehicles, nor did Plaintiffs consent to Tesla lowering the batteries' performance capacity or, in some cases, rendering the battery inoperable.

90.     Tesla's software updates caused damage and loss to Plaintiffs and other putative Class members, including a significant decrease in range and usable battery capacity, impairment of Plaintiffs' and the other class members' ability to use their own property, forcing Plaintiffs and other putative Class members to expend time, money, and labor in connection with their vehicles and to investigate and determine what the right fix would be for the Class Vehicles.

91.     As a direct and proximate result of Defendant's unlawful conduct within the meaning of California Penal Code § 502, Tesla has caused loss to Plaintiffs in an amount to be proven at trial, including (a) the cost of hiring a third party to revert back to the previous software version; and (b) the expensive cost ($15,000+) of obtaining a new battery.  Pursuant to Cal. Penal Code § 502(e)(1), Plaintiffs seek injunctive relief and compensatory damages.  Plaintiff is also entitled to recover their reasonable attorneys' fees pursuant to California Penal Code § 502(e)(2).

92.     Plaintiffs and Class members are entitled to punitive or exemplary damages pursuant to Cal. Penal Code § 502(e)(4) because Tesla's violations were willful and, upon information and belief, Tesla is guilty of oppression, fraud, or malice as defined in Cal. Civil Code § 3294(c).

## COUNT THREE

### VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW
### (CAL. BUS. & PROF. CODE § 17200, *ET SEQ.*)

93.     Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

94.     Plaintiffs bring this count on their own behalf and on behalf of the Nationwide Classes. In the alternative, Plaintiffs bring this count on their own behalf and on behalf of the State Sub-Classes.

95.     California's Unfair Competition Law (UCL), Cal. Bus. & Prof. Code § 17200 *et seq.*, proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

96. Tesla has engaged in unlawful conduct in violation of the CFAA, the CDAFA, and trespass to chattels under California common law by knowingly and intentionally causing the transmission of vehicle software updates to Plaintiffs' Class Vehicles, thereby intentionally causing damage without authorization, or, at the very least, exceeding Tesla's authorization to access the Class Vehicles.

97. Tesla knowingly and intentionally exceeded its authorized access to the Class Vehicles. Plaintiffs and other putative Class members did not consent to Tesla's manipulation of the software controlling the batteries in the Class Vehicles, including consenting to updates that would harm the performance of their vehicles, nor did Plaintiffs consent to Tesla lowering the batteries' performance capacity or, in some cases, rendering the battery inoperable.

98. Tesla's software updates caused damage and loss to Plaintiffs and other putative Class members, including a significant decrease in range and usable battery capacity, impairment of Plaintiffs' and the other class members' ability to use their own property, forcing Plaintiffs and other putative Class members to expend time, money, and labor in connection with their vehicles and to investigate and determine what the right fix would be for the Class Vehicles.

99. Plaintiffs and the putative Class members seek to enjoin Tesla's unlawful and unfair acts pursuant to Cal. Bus. & Prof. Code § 17200 *et seq*.

100. Plaintiffs and the putative Class also seek attorneys' fees and any other just and proper relief available.

**COUNT FOUR**

**TRESPASS TO CHATTEL**

101. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

102. Plaintiffs bring this count on their own behalf and on behalf of the Nationwide Classes. In the alternative, Plaintiffs bring this count on their own behalf and on behalf of the State Sub-Classes.

103. It is a violation of California's common law prohibition of trespass to chattels if a "(1) defendant intentionally and without authorization interfered with plaintiff's possessory interest in the computer system; and (2) defendant's unauthorized use proximately resulted in

damage."[36]  "Damage" includes when the trespass impaired the condition, quality, usefulness, or value of the personal property.

104.    Tesla impaired the condition, quality, usefulness, and value of the Class Vehicles, without Plaintiffs' or Class members' knowledge or consent.  These acts constitute an intentional interference with the use and enjoyment of the vehicles.

105.    Tesla acted intentionally because it deliberately pushed out software updates for the Class Vehicles that reduced the performance and usable capacity of the vehicles.  At no point did Plaintiffs and putative Class members agree to software updates that would diminish the performance of their vehicles and the batteries.

106.    Tesla engaged in deception in order to gain access to the vehicles and install new computer software updates.  Through its own pre-update testing, Tesla must have known about the harmful effects of the software update on the Class Vehicles, including their battery performance.  Nor did Tesla advise customers of the harmful effects of the software updates.

107.    Plaintiffs and putative Class members suffered actual damages as a result of Tesla's actions in an amount to be determined at trial.

108.    Plaintiffs and the Class also seek punitive damages because Defendant engaged in aggravated and outrageous conduct with an evil mind. Indeed, Defendant carried out despicable conduct with willful and conscious disregard of the rights of others. Defendant's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

**B.      Claims brought on behalf of the Illinois Sub-Class**

<u>**COUNT ONE**</u>

**TRESPASS TO CHATTEL**

109.    Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

110.    Plaintiffs bring this count on their own behalf and on behalf of the Nationwide Classes. In the alternative, Plaintiffs bring this count on their own behalf and on behalf of the Illinois Sub-class.

---

[36] *In re Apple Inc. Device Perf. Litig.*, 347 F. Supp. 3d 434, 455 (N.D. Cal. 2018).

111.    It is a violation of Illinois' common law prohibition of trespass to chattels if a defendant engages in unauthorize use of or intermeddling with another's physical property.[37] "Damage" includes when the trespass impaired the condition, quality, or value of the personal property.

112.    Tesla impaired the condition, quality, and value of the Class Vehicles, without Plaintiffs' or Class members' knowledge or consent.  These acts constitute an intentional interference with the use and enjoyment of the vehicles.

113.    Tesla acted intentionally because it deliberately pushed out software updates for the Class Vehicles that reduced the performance and usable capacity of the vehicles.  At no point did Plaintiffs and putative Class members agree to software updates that would diminish the performance of their vehicles and the batteries.  Nor did Tesla advise customers of the harmful effects of the software updates.

114.    Tesla engaged in deception in order to gain access to the vehicles and install new computer software updates.  Through its own pre-update testing, Tesla must have known about the harmful effects of the software update on the Class Vehicles, including their battery performance.

115.    Plaintiffs and putative Class members suffered actual damages as a result of Tesla's actions in an amount to be determined at trial.

116.    Plaintiffs and putative Class members also seek punitive damages because Tesla's trespass was committed with fraud, actual malice, deliberate violence and oppression, and because Tesla acted willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others.

## C.    Claims brought on behalf of the Michigan Sub-Class

### COUNT ONE

### TRESPASS TO CHATTEL

117.    Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

---

[37] *Fidlar Tech. v. LPS Real Estate Data Sols., Inc.*, 2013 WL 5973938, at *10 (C.D. Ill. Nov. 8, 2013).

118.    Plaintiffs bring this count on their own behalf and on behalf of the Michigan Sub-Class.

119.    It is a violation of Michigan's common law prohibition on trespass to chattels if a defendant "dispossesses another of or intentionally and harmfully interferes with another's property."[38]

120.    Tesla impaired the condition, quality, and value of the Class Vehicles, without Plaintiffs' or Class members' knowledge or consent.  These acts constitute an intentional interference with the use and enjoyment of the vehicles.

121.    Tesla acted intentionally because it deliberately pushed out software updates for the Class Vehicles that reduced the performance and usable capacity of the vehicles.  At no point did Plaintiffs and putative Class members agree to software updates that would diminish the performance of their vehicles and the batteries.  Nor did Tesla advise customers of the harmful effects of the software updates.

122.    Tesla engaged in deception in order to gain access to the vehicles and install new computer software updates.  Through its own pre-update testing, Tesla must have known about the harmful effects of the software update on the Class Vehicles, including their battery performance.

123.    Plaintiffs and putative Class members suffered actual damages as a result of Tesla's actions in an amount to be determined at trial.

**D.    Claims brought on behalf of the Washington Sub-Class**

**<u>COUNT ONE</u>**

**TRESPASS TO CHATTEL**

124.    Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

125.    Plaintiffs bring this count on their own behalf and on behalf of the Washington Sub-Class.

---

[38] *Livonia Prop. Holdings, LLC v. 12840-12976 Farmington Road Holdings, LLC*, 717 F. Supp. 2d 724, 739 (E.D. Mich. 2010).

126.     It is a violation of Washington's common law prohibition of trespass to chattels if a defendant engages in "the intentional interference with a party's personal property without justification that deprives the owner of possession or use"[39]  It may be committed by intentionally (a) dispossessing another of the chattel, or (b) using or intermeddling with a chattel in the possession of another.

127.     Tesla impaired the condition, quality, and value of the Class Vehicles, without Plaintiffs' or Class members' knowledge or consent.  These acts constitute an intentional interference with the use and enjoyment of the vehicles.

128.     Tesla acted intentionally because it deliberately pushed out software updates for the Class Vehicles that reduced the performance and usable capacity of the vehicles.  At no point did Plaintiffs and putative Class members agree to software updates that would diminish the performance of their vehicles and the batteries.  Nor did Tesla advise customers of the harmful effects of the software updates.

129.     Tesla engaged in deception in order to gain access to the vehicles and install new computer software updates.  Through its own pre-update testing, Tesla must have known about the harmful effects of the software update on the Class Vehicles, including their battery performance.

130.     Plaintiffs and putative Class members suffered actual damages as a result of Tesla's actions in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the putative Class, respectfully request that this Court enter judgment in their favor and against Tesla as follows:

A.     Certification of the proposed Class and Sub-Classes, including appointment of Plaintiffs' counsel as Class Counsel;

---

[39] *United Federation of Churches, LLC v. Johnson*, 598 F. Supp. 3d 1084, at *1099 (W.D. Wash. 2022).

B.      An order temporarily and permanently enjoining Tesla from continuing unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.      Injunctive relief in the form of an adequate recall, free replacement, or vehicle buy-back program;

D.      An order establishing Tesla as a constructive trustee over profits wrongfully obtained, plus interest;

E.      Costs, restitution, damages, including punitive damages, exemplary damages and treble damages, and disgorgement in an amount to be determined at trial;

F.      An order requiring Tesla to pay both pre- and post-judgment interest on any amounts awarded;

G.      An award of costs and attorney's fees; and

H.      Such other or further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

1    Dated: May 12, 2023                    HAGENS BERMAN SOBOL SHAPIRO LLP

2

3                                           By: */s/ Ben M. Harrington*

4

5                                               Ben M. Harrington (SBN 313877)
                                                HAGENS BERMAN SOBOL SHAPIRO LLP
6                                               715 Hearst Avenue, Suite 202
                                                Berkeley, CA 94710
7                                               Telephone: (510) 725-3000
                                                Facsimile:  (510) 725-3001
8                                               Email: benh@hbsslaw.com

9
                                                Steve W. Berman (*pro hac vice* forthcoming*)*
10                                              Jerrod C. Patterson (*pro hac vice* forthcoming*)*
                                                HAGENS BERMAN SOBOL SHAPIRO LLP
11                                              1301 Second Avenue, Suite 2000
                                                Seattle, WA  98101
12                                              Telephone: (206) 623-7292
                                                Facsimile:  (206) 623-0594
13                                              Email:    steve@hbsslaw.com
                                                          jerrodp@hbsslaw.com
14
                                                Eric J. Harrison (*pro hac vice* forthcoming*)*
15                                              Attorney West Seattle
                                                5400 California Ave. SW Suite E
16                                              Seattle, WA 98136
                                                Telephone: (206) 745-3738
17                                              Email:    eric@attorneywestseattle.com

18                                              *Attorneys for Plaintiffs and the Proposed Classes*

19

20

21

22

23

24

25

26

27

28